IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Ft. Myers Division



FILED

01 JUN 18 AM 11: 01

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS, FLORIDA

---

NATIONAL BUSINESS AVIATION
ASSOCIATION, INC. and GENERAL
AVIATION MANUFACTURERS
ASSOCIATION

    Plaintiffs,

v.

CITY OF NAPLES AIRPORT AUTHORITY,

    Defendant.

---

Case No. 2:00-cv-572-FTM-29DNF

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE ARE NO GENUINE ISSUES

Frank J. Costello
ZUCKERT, SCOUTT & RASENBERGER, L.L.P.
888 Seventeenth St., N.W. #600
Washington, D.C. 20006
(202) 298-8660
(202) 342-0683 (fax)

Theodore L. Tripp, Jr. (Florida Bar No. 221856)
GARVIN & TRIPP
2532 East First Street
Fort Myers, FL 33902
(941) 334-1824
(941) 334-6848 (fax)

Attorneys for Plaintiffs,
National Business Aviation Association, Inc. and
General Aviation Manufacturers Association

Dated: June 18, 2001

3✗

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Ft. Myers Division

| | |
|---|---|
| NATIONAL BUSINESS AVIATION ASSOCIATION, INC. and GENERAL AVIATION MANUFACTURERS ASSOCIATION<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF NAPLES AIRPORT AUTHORITY,<br><br>Defendant. | Case No. 2:00-cv-572-FTM-29DNF |

PLAINTIFFS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE ARE NO GENUINE ISSUES

Pursuant to Fed. R. Civ. P. 56(c), Plaintiffs offer the following statement of material facts as to which there are no genuine issues in support of their motion for summary judgment. Exhibit references in this statement are to the accompanying Exhibit Book.

**The Parties**

1. Plaintiff National Business Aviation Association, Inc. (NBAA) is a not-for-profit corporation incorporated under the laws of the District of Columbia and headquartered at 1200 Eighteenth Street, N.W., Washington, D.C. NBAA represents over 6,000 member companies which own and operate over 8,000 general aviation aircraft to facilitate the conduct of their businesses or which are otherwise involved with business aviation. NBAA members comprise a substantial segment of the general aviation community. NBAA acts as a spokesperson for business aviation before government agencies and the U.S. Congress and, in selected cases of importance, such as this one, represents its members' interests by initiating or participating in

court actions and/or proceedings before regulatory agencies such as the Federal Aviation Administration (FAA). (Amended Complaint ¶ 1).

2. There are estimated to be 1,234 Stage 2 aircraft weighing 75,000 lbs. or less on the United States registry, 450 of which are operated by NBAA members. (Exhibit 22, Testimonial Declaration of Joseph Hart). At least one NBAA member (Continental Aviation, Inc.) operates a Stage 2 aircraft that is based at the Naples Municipal Airport (the Airport). NBAA members own and operate Stage 2 aircraft based at other airports that those members fly into and out of the Naples Airport in the course of conducting their businesses. Fourteen NBAA members (other than Continental Aviation, Inc.) initially applied for short-term waivers to operate Stage 2 aircraft to/from the Airport. NBAA members also include companies that provide services for operators of Stage 2 aircraft, including fuel service, maintenance and repair service and other flight-related and ground-support related matters. NBAA members also include companies that manufacture, install and maintain equipment and furnishings used in such Stage 2 aircraft, as well as companies that buy and sell, lease, manage and charter such Stage 2 aircraft. There are seventeen NBAA members (other than Continental Aviation, Inc.) that provide such services at the Airport. The individual members of NBAA operating to and from APF each would have standing in its own right to maintain this action, but the participation of individual NBAA members is not required for purposes of the claim stated or for the relief requested herein. (Amended Complaint ¶ 1.; Exhibit 4, Answers of Plaintiff NBAA To Defendant's First Set of Interrogatories, at 4-5).

3. Plaintiff General Aviation Manufacturers Association (GAMA) is a not-for-profit corporation incorporated under the laws of the District of Columbia and headquartered at 1400 K Street, N.W., Washington, D.C. GAMA is national trade association representing over 50

manufacturers of fixed-wing aircraft and aircraft engines, avionics, and components. In addition to manufacturing nearly all of the nation's general aviation aircraft, GAMA members also operate aircraft fleets, maintenance facilities, pilot schools, and training facilities across the country. While GAMA members no longer manufacture Stage 2 business jets, they have a continuing interest in the viability and utility of such aircraft. GAMA members take such Stage 2 aircraft in trade from purchasers of new aircraft and then resell the Stage 2 aircraft. GAMA members also continue to manufacture, sell and provide service for parts for Stage 2 aircraft. And GAMA members operate factory-owned service centers that service Stage 2 aircraft. The individual members of GAMA each would have standing in its own right to maintain this action, but the participation of individual GAMA members is not required for purposes of the claim stated or for the relief requested herein. (Amended Complaint ¶ 2).

4. Defendant Naples Airport Authority (the Authority) is an independent agency established by the Florida Legislature pursuant to the City of Naples Airport Authority Act, Section 15 of Chapter 69-1326, Laws of Florida. The Authority is the operator of the Airport. (Amended Complaint ¶ 3).

**Federal Regulation of Aircraft and Airport Noise**

5. The FAA, acting pursuant to a Congressional directive and consistent with international standards, addresses aircraft noise at the source by imposing noise certification requirements on newly manufactured aircraft. These standards establish three maximum levels for jet aircraft takeoff and landing noise, respectively, Stages 1, 2 and 3, with Stage 1 the "noisiest and Stage 3 the "quietest." The maximum noise levels are not uniform within each stage. Heavier aircraft are permitted to generate more noise. For example, the maximum noise level on takeoff for the heaviest Stage 3 aircraft is 106 EPNdB, i.e., the FAA cannot initially

certificate an aircraft type if it generates noise in excess of that level. The maximum noise level decreases as the weight of the aircraft decreases. The corresponding maximum noise level for a Stage 2 aircraft weighing 75,000 pounds or less is 93 EPNdB. The requirements for Stage 2 jet aircraft do not decrease below 75,000 pounds. 14 C.F.R. § 36, App. C, § C36.5.

6. Smaller Stage 2 aircraft can be and often are quieter than some heavier Stage 3 aircraft. Indeed, some Gulfstream II and III aircraft weighing 75,000 pounds or less utilizing "Quiet Flying" operational procedures can generate noise profiles similar to those of Stage 3 aircraft weighing 75,000 pounds or less. (Exhibit 16, Hilton Dep. at 82-3). The types of Stage 2 small jet aircraft that operate to and from the Airport generate less noise than the a piston engine DC-3 -- and there are nearly as many DC-3 operations at that airport as small jet operations. (Exhibit 18, Berardino Dep. at 113; Exhibit 3, Appendix, Revised Fleet Mix).

7. Pursuant to guidelines in 14 C.F.R. Part 150, the FAA's regulations implementing the Aviation Safety and Noise Abatement Act, 49 U.S.C. § § 57501 et seq., airports use the Day-Night Average Sound Level (DNL) for operations on the average day (i.e., total annual operations divided by 365) to define areas of non-compatible land. (Part 150 is reproduced as Exhibit 19 hereto). Most federal agencies dealing with noise have formally adopted the DNL metric. The Federal Interagency Committee on Noise reaffirmed the appropriateness of DNL in 1992 by stating: "There are no new descriptors or metrics of sufficient standing to substitute for the present DNL cumulative noise exposure metric." In recognition of the widespread use of the DNL metric, the FAA's regulations at 14 C.F.R. Part 161 implementing the Airport Noise and Capacity Act (ANCA), 49 U.S.C. § § 47521 et seq., require the use of the metric for analysis of noise impacts and benefits in a Part 161 Study. (Part 161 is reproduced in Exhibit 20 hereto). Use of the DNL metric also was reaffirmed by the FAA last year as "the only metric backed with

a substantial body of scientific survey data on the reactions of people to noise." (Exhibit 23, 65 Fed. Reg at 43819). The consultants for the Authority adhered to these requirements in the Part 161 study prepared on June 30, 2000 and at issue herein. (Exhibit 1 at 15).

8. In simple terms, DNL is the average noise level over a 24-hour period, except that noises occurring at night (defined as 10:00 p.m. through 7:00 a.m.) are artificially increased by 10 decibels. This 10 dB penalty means that one nighttime sound event is equivalent to 10 daytime events of the same level. A decibel (dB) is a unit (on a scale of 1 to 130, starting with the faintest audible sound) for measuring the relative loudness of sounds equal approximately to the smallest degree of difference of loudness ordinarily detectable by the human ear. The DNL can be measured or estimated. Measurements are practical only for obtaining DNL values for relatively limited numbers of points, and, in the absence of a permanently installed monitoring system, only for relatively short time periods. Most airport noise studies, including the Authority's Part 161 study, are based on computer-generated DNL estimates, depicted in terms of equal-exposure noise contours (much as topographic maps have contours of equal elevation). (Exhibit 1 at 15; Exhibit 17, at 3; Webster's Third International Dictionary, Unabridged, at 585).

9. The FAA's Part 150 guidelines consider the 65 dB DNL contour to be the normal limit of land use compatibility. (Exhibit 1 at 15). No restriction on access to a federally obligated airport has ever been based on residential impacts below the significant exposure level of DNL 65 dB. (Exhibit 14 at 2). Last year, the FAA reaffirmed that the "DNL 65 dB contour remains the FAA's lower limit for defining significant noise impact on people." (Exhibit 23, 65 Fed. Reg. at 43820).

**Aircraft Noise at the Naples Municipal Airport**

10. The instant dispute aside, the Authority has a comprehensive noise mitigation and abatement program, a program with which Plaintiffs fully cooperate. (Exhibit 5). The Authority has received FAA approval for, and subsequently implemented, a number of measures intended to reduce the effects of aircraft noise around the Airport. Those measures include: a preferential runway procedure maximizing use of the runway departing to the northeast for departures and to the southwest for landings, thus reducing the number of flights over the vocal community living to the southwest of the Airport; voluntary flight paths; a ban on nighttime runups; and a ban on Stage 1 jet operations. (Exhibit 1 at 14, Table 2-1). The Authority received FAA approval to establish a land use buffer zone around the airport within the 60 dB LDN contour, as discussed in more detail in below. The Authority also encourages jet operators to utilize NBAA's recommended noise abatement close-in, approach and landing procedures and refrain from operations at night whenever possible. (Exhibit 2 at 3-6; Exhibit 5). Although the number of jet operations has nearly doubled over the last three years, the number of nighttime operations has remained relatively stable and is projected to decrease by 2005. (Exhibit 3 at 10; Exhibit 1 at 31, Table 5-1). Because of these and related measures, incompatible land use within the Airport's DNL 65 dB contour has been eliminated. There are no incompatible uses within the DNL 65 dB contour today, and none are anticipated for the future. (Exhibit 1 at 69; Exhibit 2 at 13-14).

11. In 1997, the Authority and the surrounding jurisdictions, with FAA approval, implemented the adoption of the 60 dB DNL contour for zoning and land use planning purposes, i.e., for the creation of a buffer zone around the airport. (Exhibit 1 at 14, Table 2-1). The Authority did not engage in a land acquisition program between the 60 and 65 dB DNL contours on the grounds that the cost, estimated to be $5.3 million, was too high. (Exhibit 2 at 9).

Although the City of Naples did not prohibit development within the DNL 60 dB LDN contour over which it has jurisdiction (primarily the property to the west of the airport where most of the 60 dB LDN contour population resides), extraordinary City Council approval must be obtained for such projects. The City states that it has approved no residential development within the DNL 60 dB contour since the special district buffer zone was established in 1998, although one development (Bayfront Marketplace) subsequently was deemed to be inside the 60 dB contour but outside the City's special district. The City worked with the developer to have included on the front page of all Bayfront condominium documents the following disclaimer:

> No one to whom a quiet, serene residential environment is important should consider purchasing a unit in this condominium for his own use and occupancy. The Naples Municipal Airport is located less than one mile to the northeast of the condominium, in close proximity to the community. Purchasers can expect all the usual and common noise and disturbances created by and incident to, the operation of the airport.

(Exhibit 2 at 12). Bayfront, which was still under construction at the time the Authority submitted its Part 161 study to the FAA, is the largest single residential complex inside the 60 dB LDN contour, accounting at that time for an estimated 320 of the total population of 1,432 (Exhibit 1, Appendix B, 2000 Existing Conditions Population Estimates, as modified by Exhibit 3 at 44). The Authority has worked with the County to incorporate a tenant awareness clause in leases at the River Reach Apartment complex located to the northwest of the Airport. A "Noise Warning Addendum to Lease Agreement," requiring signatures by all residents, is attached to each apartment lease in accordance with the County Zoning Ordinance. (Exhibit 2 at 12). The Authority has purchased an avigation easement for the Waterside condominium complex located just south of the Airport. The Authority has purchased land around the Waterside complex in order to prevent its further expansion. (Exhibit 3 at 9).

12. According to the Authority's consultants,[1] in calendar year 2000, there were 1,152 operations (a takeoff or a landing) at the Airport by Stage 2 jet aircraft, an average of 3.15 operations per day. Of those operations, approximately 44 were at night during the course of the year, an average of one Stage 2 jet takeoff or landing every eighth night. In 2000, there were 13,154 operations at the Airport with Stage 3 jets, an average of 35.94 per day. Nighttime operations by Stage 3 jets averaged 1.48 per night. In 2000, there were approximately 101,818 operations at the airport by propeller-driven aircraft (both turboprop and piston aircraft), an average of 278.19 operations per day. Nighttime operations by propeller-driven aircraft averaged 3.7 per night. (Exhibit 3, Appendix, Revised Fleet Mix tables).

13. The consultants for the Authority forecast that in 2005, with no new restrictions on aircraft operations, there will be approximately 792 operations at the Airport by Stage 2 jet aircraft, an average of 2.17 operations per day. Of those operations, approximately 29 will be at night, an average of one Stage 2 jet takeoff or landing every twelfth night. In 2005, there will be 20,039 operations at the Airport with Stage 3 jets, an average of 54.9 per day. Nighttime operations by Stage 3 jets will average 2.04 per night. In 2005, there will be approximately 126,911 operations at the airport by propeller-driven aircraft (both turboprop and piston aircraft), an average of 347.7 operations per day. Nighttime operations by propeller-driven aircraft will average 4.62 per night. (Exhibit 3, Appendix, Revised Fleet Mix Tables).

---

[1] These estimates originally appeared in the Authority's Part 161 study submitted to the FAA in June 2000. (Exhibit 1). The Authority's consultants submitted revised estimates to the FAA in October 2000. (Exhibit 3). Those same estimates again appeared in the Authority's Noise exposure Map Update submitted to the FAA in November 2000. (not attached hereto). Plaintiffs are relying on the latter estimates for purposes of this motion, although they do not necessarily agree with those estimates.

14. These statistics translate into the following percentages of operations at the Airport represented by Stage 2 jets:

| Stage 2 Jets as % of | 2000 | 2005 (w/o restrictions) |
|---|---|---|
| All operations | 0.9% | 0.5% |
| All nighttime operations | 2.1% | 0.8% |
| All jet operations | 8.1% | 5.6% |
| All nighttime jet operations | 8.1% | 3.7% |

15. Although Stage 2 operations constitute a *de minimis* percentage of total operations at the airport, they are important to the owners and operators of the aircraft. The Authority's consultants, in a user survey conducted for the period April 1999 - February 2000, identified 174 likely Stage 2 aircraft that operated at the Airport in that period. (Exhibit 1 at 34). Most of the Stage 2 operations at the Airport are to or from points outside Florida. Seventeen of the persons initially applying for Stage 2 waivers at the airport were headquartered outside Florida. At least five other Stage 2 operators submitting comments to the Authority in opposition to the proposed Stage 2 ban were located outside Florida. Finally, Continental Aviation, Inc., the only Stage 2 operator actually based at the Airport, conducts the majority of its flights to or from points outside Florida. (Exhibit 4, Plaintiff NBAA's Answers To Defendant's First Interrogatories, at 6-7).

**The Part 161 Study**

16. On or about June 30, 2000, the Authority submitted a Part 161 study to the FAA purporting to justify the imposition of a ban on Stage 2 jet operations at the Airport. Part 161 was promulgated by the FAA to implement ANCA. ANCA had two primary components: (1) A phase-out of all transport category Stage 2 aircraft (i.e., aircraft with maximum weight of greater

than 75,000 pounds) in the U.S. by December 31, 1999, and (2) a requirement that any proposed local action restricting airport access by Stage 2 or Stage 3 aircraft be subject to certain mandatory federal procedures. ANCA requires an airport proprietor proposing a Stage 2 restriction to provide the FAA with certain cost-benefit analyses of the proposed restriction and of alternatives to the restriction and requires the proprietor to provide public notice and an opportunity for comment. 49 U.S.C. § 47524(b); 14 C.F.R. Part 161, Subpart C. Additionally, if an airport proprietor accepts federal grant funds (as does the Authority), the proprietor is required to make contractual assurances to the federal government that the airport will be available for public use on fair and reasonable terms, and without unjust discrimination. (Exhibit 3 at 12).

17. Numerous persons filed comments with the Authority with respect to the Part 161 study, including NBAA (Exhibit 7) and the FAA. (Exhibit 8). NBAA raised many of the issues involved in this matter. The FAA criticized the Part 161 study for concluding that "all reasonably feasible non-restrictive measures to achieve its land use compatibility goal" had been exhausted without documenting how it reached that conclusion. The FAA also raised certain questions about the cost-benefit analysis that was performed in the Study, including questions about the extent to which residential development within the 60 dB DNL contour had been permitted after the FAA had approved the use of this contour as a "buffer" to prevent such development.

18. The premise of the Part 161 study is that a ban on Stage 2 operations will move some persons presently living between the 60 and 65 dB LDN contours outside the 60 dB contour line. The Authority's consultants estimate that there were 1,432 people living between the 60 and 65 dB LDN contours in the year 2000 and that this number would be reduced to 130 people by a ban on Stage 2 operations. The consultants estimate that the effect of the ban in 2005 would be

to reduce the number of people living between the 60 and 65 dB LDN contours from 1,282 to 370 people. (Exhibit 3 at 44).[2]

19. The consultants for the Authority estimate that the cost of the Stage 2 ban on the Stage 2 operators and their vendors would be $6.6 to $8 million in the first year (assumed for purposes of analysis to be 2000) and $781,000 to $1.6 million in the fifth year. They did not estimate the costs for other years, nor did they estimate the economic impact on the community through loss of these flights. (Exhibit 1 at 63, Table 8-2). The consultants for the Authority estimate that 712 residential properties would be shifted out of the 60 dB LDN contour, and that those properties have an appraised value of $67.5 million, an average of $95,000 per property. (Exhibit 1 at 80 and Appendix B, 2000 Forecast Conditions Population Estimates and 2000 Alternative 24 Hour Restriction On Stage 2 Jet Operations Population Estimates).[3] They did not, however, quantify the benefits of a Stage 2 ban to the allegedly affected population within the 60-65 dB LDN contours. (Exhibit 1 at 78-80). Plaintiffs' expert economist, Mr. Berardino, testified that for the benefits of the Stage 2 ban to exceed the costs, the current *de minimis* Stage 2 operations at the Airport would have to depress the value of the homes in the 60 to 65 dB LDN contour by at least $30,000 -- approximately one-third of their assessed value. He considered such to be unlikely. (Exhibit 18; Berardino Dep. at 109-12).

20. While complaint analyses are not normally considered a scientific basis for evaluating noise impacts because of their highly subjective nature, the Authority's consultants

---

[2] These estimates were submitted to the FAA in October 2000 and reflect downward revisions from the estimates submitted in the Part 161 study.

[3] The actual number of units within the 60 dB LDN contour is not clear. A later submission by the Authority to the FAA in October 2000 identifies a total of 633 residential units within the 60 dB contour at that time. (Exhibit 3 at 19).

view them as a valid indication of annoyance. Although Stage 2 operations constituted a *de minimis* percentage of overall operations at the Airport in 1999, they purported to account for 38 percent of all complaints. (Exhibit 1 at 27-28). The complaints are very subjective. According to the Authority's First Quarter 2000 Noise Report (Exhibit 6), 70% of the complaints were from residences to the southwest of the airport -- 85 from a single household and 142 from six other households. There is no information, in any of the documents, as to how many of the complaints were registered by persons living between the 60 and 65 dB LDN contours.

**Events Subsequent to the Part 161 Study**

21. On September 18, 2000, the Director of the FAA's Office of Airport Safety and Standards wrote separately to the Authority to provide the FAA's preliminary views on the question of whether the proposed Stage 2 ban is consistent with the Authority's obligations under AIP grant assurances and other federal law. (Exhibit 9) The FAA stated: "On the basis of our initial review, we have identified aspects of the proposed access regulations that appear to be, or have the potential to be, inconsistent with the obligation to provide reasonable access to the airport." As the FAA explained in its letter:

> You should understand that no airport access restriction has previously been approved based solely on the existence of residential areas outside the DNL 65 dB contour. Not only is the operating restriction proposed by the Authority based solely on impacts to the DNL 60 dB level, it is also the broadest kind of restriction: a total ban on a category of operator. In order to present a case that any particular operating restriction is reasonable, it will be necessary for the Authority to identify the specific noise-related problem it is seeking to address, and to show that it has considered a full range of alternatives that address the problem—starting with measures that do not involve operating restrictions, and including any more narrowly tailored restrictions that would address the identified noise problem.

22. NBAA thereafter met with representatives of the Authority in an effort to discuss possible alternatives to the Stage 2 ban (and to litigation). NBAA expressed its willingness to

work actively and cooperatively with the Authority and the Airport staff and with the business aviation community to develop and implement additional voluntary measures to reduce single-event and cumulative aircraft noise at APF, provided that the Authority would not adopt the Stage 2 ban. (Amended Complaint ¶ 32).

23. On November 16, 2000, the Authority adopted the Stage 2 ban effective January 1, 2001, Resolution No. 2000-8. (Exhibit 10). The Resolution amends Section 5 of the Naples Airport Rules and Regulations ("Aeronautical Activities") by adding the following section 5.06 B.3:

> All aircraft certificated as meeting Stage 2 noise limits identified in 14 C.F.R. Part 36, App. C Subsection 36.5, as the same may be amended in the future, are prohibited.

Government aircraft, law enforcement, emergency, fire and rescue aircraft, and aircraft operated for other "bona fide emergency purposes" are exempted from the restriction under Section 10.4 of the Rules and Regulations. The Resolution also amends Section 10 of the Airport Rules and Regulations by adding section 10.7, "Waivers from Stage 2 Restriction." This section permits an aircraft operator to apply to the NAA for a temporary waiver of the Stage 2 ban for a period not exceeding six months and which cannot extend beyond December 31, 2001.[4] A temporary waiver application must document that the operator has committed to either "retrofitting the

---

[4] On December 21, 2000, the NAA granted applications for temporary waivers from the Stage 2 ban to five operators of Stage 2 aircraft, pursuant to Section 10.7 of the Airport Rules and Regulations. Three of the waivers are for a period of up to six months (to June 30, 2001), one is for a period of up to three months (to March 31, 2001) and one is for a period of up to two months (to February 28, 2001). (Amended Complaint ¶ 34).

aircraft to be recertificated as FAR Part 36 Stage 3 within the waiver period"[5] or "replacing the aircraft with a Stage 3 aircraft within the waiver period." Any prohibited operation of a Stage 2 aircraft at the Airport after December 31, 2000 is punishable by a fine of $500 per offense. Airport Rules and Regulations, Sections 10.2, 10.3. Additionally, any aircraft owner or operator with two or more violations of the Stage 2 ban within any three-year period may be subject to a one-year denial of the right to land or take off from the Airport, and any such operator who is a tenant at the Airport may be treated as having defaulted under its lease. Airport Rules and Regulations, Section 10.6 C.

24. On December 27, 2000, the FAA's Acting Associate Administrator for Airports wrote the Authority to initiate informal resolution of the Authority's apparent noncompliance with Part 161. (Exhibit 11). In that letter, "[t]he FAA strongly recommends that NAA [the Authority] defer any implementation or enforcement of the ban until completion of the process to determine compliance under Subpart F of Part 161." The letter focused on the Authority's failure to analyze properly nonrestrictive alternatives to the ban, but also stated that the issue of "whether the NAA's use of the DNL 60 dB contour to justify the Stage 2 ban complies with ANCA and Part 161 . . . will be addressed in separate correspondence, which will be provided shortly."

---

[5] Modification of a Stage 2 jet to meet the FAA's Part 36 Stage 3 certification standards requires the installation of an FAA-certificated "hushkit." Hushkits are available for some Stage 2 jets, but are not yet available for the Gulfstream II and III aircraft. The consultants for the airport estimate that the installed cost of a hushkit for a Gulfstream aircraft, when available, will be $1.9 million. Hushkits for other aircraft range from $132,000 to $3.78 million. (Exhibit 1 at 53-4, Tables 7-5 and 7-6; Exhibit 16, Hilton Dep. at 55-6; Exhibit 21, Etter Dep. at 63).

25. Representatives of the Authority met with the FAA on January 4, 2001. Following up on that meeting, and a public meeting in Naples on January 18, the FAA addressed another letter to the Authority on January 30, 2001. (Exhibit 12). The letter advised the Authority that extension of the airport noise study area outside the 65 dB DNL contour must be justified by "reasonable circumstances," including an opportunity for further public comment. The letter went on to state that "with respect to the FAA's grant assurance determinations, it is only fair to tell you that our substantive considerations to date are not favorably inclined to find it reasonable to address the particular circumstances at Naples between the DNL 60 and 65 dB noise contours with a total ban on a class of user (i.e., Stage 2 aircraft operators)." (emphasis added).

26. On February 7, 2001, the Authority deferred enforcement of the Stage 2 ban until March 15, 2001. (Exhibit 13).

27. In a letter to the Authority dated February 16, 2001, the FAA was more explicit about the failure to comply with the grant assurances, finding that "the ban on Stage 2 operations is not a reasonable restriction on the use of the airport and is not permitted under the assurances in the Authority's grant agreements." (Exhibit 14). The FAA stated that "we do not find that the circumstances at Naples Airport warrant a restriction on access prohibiting an entire class of aircraft (Stage 2) from using the airport for the purpose of reducing average annual noise exposure in residential areas at levels between DNL 65 and 60 dB." The letter "does not represent a formal determination on compliance with Federal grant assurances, which would be made only on the basis of a full record developed under the process described in 14 C.F.R. Part 16. In view of the Authority's suspension of enforcement of the Stage 2 ban and the Authority's longstanding cooperation and assistance in providing information on its airport noise concerns,

we are providing our views in an opinion letter rather than through the grant enforcement program."

28. In a letter dated March 14, 2001 and following up on a February 20 meeting with the Authority's representatives on the scope of work for the Authority's supplemental Part 161 analysis, the FAA addressed the format and public notice procedures for the supplemental analysis. (Exhibit 15). With regard to the latter, the FAA advised the Authority that the public notice for the supplemental analysis would have to follow the procedures set forth at 14 C.F.R. § 161.203 and 161.209. Those procedures basically require a minimum 180-day public comment period before a Stage 2 access restriction can be implemented.

29. On March 15, 2001, the Authority further deferred enforcement of the Stage 2 ban until July 21, 2001. The Authority has advised Plaintiffs that "enforcement may or may not be deferred beyond that date. The Authority has insufficient knowledge to determine when, if or how the enforcement of the Stage 2 ban will be affected, if at all, by any supplemental analysis. Upon information and belief, the supplemental analysis will be completed in May or June. The Authority has not determined what, if any, notice, comment or waiting period will be afforded on the supplemental analysis." (Exhibit 24, Defendant's Answers to Plaintiffs' First Interrogatories at 2).

Respectfully submitted,

_____
Frank J. Costello
ZUCKERT, SCOUTT & RASENBERGER, L.L.P.
888 Seventeenth St., N.W. #600
Washington, D.C. 20006
(202) 298-8660
(202) 342-0683 (fax)

16

        Theodore L. Tripp, Jr.  (Florida Bar No. 221856)
        GARVIN & TRIPP
        2532 East First Street
        Fort Myers, FL  33902
        (941) 334-1824
        (941) 334-6848 (fax)

        Attorneys for Plaintiffs,
        National Business Aviation Association, Inc. and
        General Aviation Manufacturers Association

Dated:  June 18, 2001